■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN NAPOLITANO, Appellant. — Judgment of the Supreme Court, New York County (Ernst Rosenberger, J.), rendered October 18, 1982, convicting defendant of one count of grand larceny in the second degree and one count of grand larceny in the third degree and imposing concurrent sentences, affirmed.

We find that the denial by the trial court of defendant's pretrial motion to sever the two counts of the indictment charging grand larceny in the second and third degrees (CPL 200.20, subd 3) did not constitute an abuse of discretion as a matter of law. As indicated in the dissent of our brother Sullivan, which fairly sets forth the facts, these two different criminal transactions were joinable pursuant to CPL 200.20 (subd 2, par [c]). However, it was the burden of the movant, pursuant to subdivision 3, to persuade the court that the severance should be granted "in the interest of justice and for good cause shown". It was incumbent upon defendant to articulate in concrete terms why he would be unduly prejudiced by the failure to sever, and this he did not do. The trial court exercised its discretion and denied the motion. That decision is reviewable on appeal to this court only to the extent that there has been an abuse of that discretion as a matter of law (see *People v Lane,* 56 NY2d 1, 7, 8, 10). This record does not reveal such an abuse.

The substance of defendant's position on appeal, and of both dissents, is that the joinder of the second larceny (grand larceny in the third degree), which arose out of the police "integrity test" inspired by the first larceny (grand larceny in the second degree), was so inherently prejudicial as to deprive defendant of a

fair trial, by consequence of which the trial court's denial of the severance motion was an abuse of discretion, regardless of the inartful manner in which the issue was articulated.

The issue is troublesome. But it is troublesome almost invariably when several different though similar criminal transactions are joined for trial. The cumulative effect of the admission of evidence of separate crimes, no matter how carefully managed by the trial court and no matter the consummate artistry with which a jury is charged, may well have an effect. Nevertheless, the Legislature has seen fit to permit joinder even though based upon different criminal transactions provided that the offenses are defined by the same or similar statutory provisions and consequently are the same or similar in law (CPL 200.20, subd 2, par [c]). Such joinder has been repeatedly upheld as constitutional (see *People v Hetherington,* 27 NY2d 242, 245-246, and cases cited therein).

The issue is whether the defendant has been deprived of a fair trial; specifically, was the second larceny so different in nature from the first and of so much greater impact because it arose out of an "integrity test" that it tainted the jury's consideration and resulted in a conviction which might not otherwise have come to pass. We think not. Certainly not with respect to the "integrity test" larceny, for the evidence of guilt was overwhelming and there can be little argument otherwise. More to the point, we think the utterly conclusive proof of the second larceny did not taint the first, for even here, the strength of the specific evidence is more than sufficient for the jury to have found a solid case for conviction. What began as a complaint "which was largely uncorroborated and depended upon the credibility of a complainant whose account, at least in some respects, was bizarre" was immeasurably strengthened by the cumulative acts of the defendant himself in returning to the complainant's apartment several times on flimsy and contrived excuses, but obviously for the purpose of ascertaining whether there were more funds available for taking, and culminating in a preposterous situation in which the defendant handcuffed the complainant as a burglar in his own apartment.

Finally, it is not inappropriate to note that the crimes were so interrelated that in all probability evidence of one would inexorably have been admissible in the other.

Given the circumstances before us we find no deprivation of due process and no abuse of the trial court's discretion. Concur — Ross, Bloom and Alexander, JJ. Kupferman, J. P., concurs in part and dissents in part, and Sullivan, J., dissents in the following memoranda.

Kupferman, J. P. (concurring in part and dissenting in part). I concur that the joinder of the two cases against the defendant was so prejudicial that despite the fact that the specific issue was not raised as such, we should reverse as to the conviction of second degree larceny and direct a new trial on that count. However, as to the count in the second case of third degree grand larceny, I would affirm.

The charge in the second case had, as its predicate, all of the facts in the first case. Moreover, in order to avoid the entrapment defense (see *United States v Myers,* 692 F2d 823, cert den 461 US 961), it was necessary to show the underlying facts which the evidence on the first charge produced.

Sullivan, J. (dissenting). Defendant, a New York City police officer, was convicted, after a jury trial, of grand larceny in the second and third degrees and sentenced to concurrent indeterminate terms of 1 to 4 years. Both crimes, charged in a single indictment, involved incidents which took place while he was on duty.

The trial evidence discloses that on the morning of May 30, 1981, with a camera and two shoulder bags slung around his neck and shoulder, Henry Nekritz left his apartment at 165 Christopher Street in Manhattan, bound for the neighborhood public library. Nekritz was carrying library books in one of the bags; in the other, which he apparently habitually carried, he had placed a second camera, three wallets and a change purse. Nekritz had, for the past 15 years, carried substantial sums of money in these wallets, which he would place in his shoulder bag because, "It felt so good carrying that much money."

Nekritz had placed $20,000 in one wallet, dividing the currency — 200 $100 bills — evenly between two compartments. He had placed another $20,000 — $1,500 in $50 bills and the balance in $100 bills — in a second wallet. Approximately $2,300 in currency and checks, of which at least $2,000 was in cash, had been placed in the third wallet. The change purse contained two gold Krugerrand coins, for which Nekritz had paid a total $1,000. Nekritz's son, who shared an apartment with his father and worked in the same camera store, apparently had no knowledge whatsoever that his father carried such large sums of money. Nekritz also carried a replica of an antique pistol, to deter would-be robbers, in a clip-type holster secured to the inside of his trousers.

As Nekritz walked he moved the holster, which had been pinching him, to the outside of his trousers. A passing cab driver saw the holster and gun and notified a nearby police officer who, before responding, called for a backup. Defendant and his partner, Figueroa, who were on radio motor patrol, responded. When

they arrived at the scene Nekritz was already being frisked by the responding officer, who recovered the gun. The officers then discussed among themselves whether Nekritz's possession of an antique pistol constituted a crime. The senior officer on the scene, Detective Reid, did not think that any crime had been committed. Nevertheless, Nekritz was turned over to defendant and Figueroa, who put him, handcuffed, into the back seat of their patrol car to be taken, so Reid believed, to the station house, where the officers would consult with a supervisor. Defendant placed Nekritz's bags on the front seat between himself and Figueroa.

Once inside the patrol car defendant told Nekritz that they were going to check whether he actually lived at the address he had given for his residence. Instead of proceeding directly to Nekritz's home, however, defendant, at Figueroa's suggestion, drove to a deserted pier. While parked at the pier defendant told Nekritz that he must have been engaged in some kind of illegal activity to have in his possession so large a sum of money. From the rear seat Nekritz could see defendant "mak[ing] a gesture like he [was] putting something in his pocket."

Defendant then drove to 165 Christopher Street. Both officers accompanied Nekritz to his apartment. Once inside, after telephoning Nekritz's son, they began to search the apartment, going through closets and pulling out drawers. While the officers were so engaged, Nekritz checked his bags and discovered that $11,000 was missing from two wallets, as well as the two Krugerrands from the change purse. He immediately accused the officers of having taken his money and coins, an accusation which defendant denied. The officers then left the apartment and returned to the patrol car. Figueroa radioed, "space cadet returned to the care of his son."

Despite the advice of two lawyers that Nekritz forego pressing a complaint, his daughter and son-in-law, on or about June 5, 1981, notified a sergeant at the Sixth Precinct that two officers from that command had stolen money from Nekritz. The matter was turned over to the Internal Affairs Division of the Police Department (IAD) and the Office of the Special State Prosecutor for the New York City Criminal Justice System. The May 30, 1981 incident eventually became the subject of the first count of the indictment.

Thereafter, on June 8, 1981, at about 4:00 P.M., Nekritz's son was alone in his father's apartment when defendant and Figueroa knocked on the door, claiming that they were responding to a report that screams had been heard in the apartment. The officers left when Nekritz's son assured them that there had not

been any such noise. The following day, in the late afternoon, Nekritz's son again was alone in the apartment when defendant and Figueroa again came to the door. Defendant, who had his gun drawn, stated that they had received a report that someone from the apartment was running around the hallway with a rifle. Nekritz's son told the officers that he was home alone, and that no such incident had occurred. He took note of defendant's shield number, which he reported to the authorities.

Approximately 2½ weeks later, on June 27, 1981, at about 4 P.M., defendant and Figueroa spoke to the managing agent of Nekritz's apartment building and, after notifying him of a report of a prowler on the fire escape, asked him to let them up to the roof. The managing agent obliged. From the roof defendant, armed with a jackknife, climbed down the fire escape until he was outside Nekritz's apartment where he had previously claimed to have seen an open window. As Figueroa and the managing agent, pursuant to plan, waited outside the door to the apartment Nekritz, inside and alone, heard the window in his living room open and saw a leg emerge through the venetian blind. Retreating to the front door, he was greeted by Figueroa, who had his gun drawn. Meanwhile, defendant, now inside the apartment, and with his gun drawn and pointed, came up behind Nekritz, handcuffed him and announced that he had caught the burglar.

Subsequently, IAD, in cooperation with the Special Prosecutor's Office, decided to undertake an integrity test to determine whether defendant or Figueroa would steal money, if given the opportunity. Shortly after 1:00 A.M. on July 28, 1981, defendant and Figueroa responded to a radio report of a car parked beside a hydrant in front of 180 Thompson Street. When they left their car to investigate, a detective, acting as a neighborhood resident, told them that an old man, recently hospitalized, was heard moaning in apartment 4A at 180 Thompson Street. Defendant and Figueroa rushed upstairs to the apartment where they found Detective Pagani, posing as an elderly invalid, lying on the floor under a coffee table. The entire apartment was wired for sound.

When the officers asked Pagani what had happened he told them that two men had come into his apartment, which, expecting company, he had left open, and knocked him unconscious. Pagani asked the officers to check the butter dish in the refrigerator. Unbeknownst to the officers $1,100 in folded currency, previously sprayed with infra-red powder, had been placed in the butter dish behind a "Land O' Lakes" butter container. Defendant went to the kitchen, and on his return to the living room, claimed to have found the refrigerator open, the butter

compartment empty and a Land O' Lakes container on the floor Defendant showed Pagani the container.

Defendant, under surveillance all the while, left the apartment. He was next observed examining the illegally parked car, and entering the patrol car, where he called in a request for a license plate check. After receiving the information defendant returned to the apartment and informed Figueroa that the car they had been asked to check out belonged to "the department." Defendant then made a telephone call from the apartment to ascertain the identity of the officer who had assigned them to that particular job. During this period the sound of running water could be heard on the tape recordings. In a second phone call from the apartment defendant told another officer that he did not "trust Internal Affairs for nothing," and that he believed they would "flake" him.

After defendant and Figueroa left the apartment Pagani checked the inside of the refrigerator and reported over a radio transmitter that the money was gone. An investigator from the Office of the Special Prosecutor returned to the apartment, examined the refrigerator and confirmed that the money was missing. An ultraviolet light was shone on Pagani's hands and the Land O' Lakes container. No traces of powder were detected.

Defendant and Figueroa, who had returned to the station house to pursue their investigation into the ownership of the illegally parked car, were detained by IAD officers. When the Special Prosecutor's investigator examined both officers' hands under an ultraviolet light, defendant's hands illuminated with an orange glow. Subsequent investigation determined that defendant had traces of powder on the fingers and palm of his right hand, on the inside edge of the right side pocket to his uniform trousers, and on the bill of his cap. Figueroa did not have any traces on his hands or uniform. The money which had been taken from the butter dish was found on the roof of the six-floor building at 180 Thompson Street, wedged between a wall and a concrete cinder block adjacent to a fire escape. The money was tested for fingerprints, but no prints were found.

Testifying in his own behalf, defendant denied having taken any money from Nekritz or from the refrigerator. He acknowledged that he was one of the officers who responded to the call for a backup on May 30, 1981 and that he searched one of Nekritz's bags. He also denied having been at Nekritz's apartment on June 8 and 9, 1981, although he did admit that he was at 165 Christopher Street on the latter date, when he intervened in a dispute between a woman and her estranged husband.

Essentially, defendant argued that he was the victim of a plot to ensnare an honest police officer, and that the procedures of the integrity test were so suspect and the testimony of Henry Nekritz so unreliable as to create a reasonable doubt. He offered a different view of the evidence: Nekritz, emotionally unstable and oblivious as to the amount of money he was carrying, enjoyed the notoriety of being a police officer's accuser; and any trace of fluorescent powder found on his person and clothing came from the Land O' Lakes container which had been in contact with the powder-sprayed currency placed behind it in the refrigerator.

I would reverse the conviction since I believe that the denial of defendant's pretrial motion to sever the two counts in the indictment was an abuse of discretion. Though based upon different criminal transactions, the two counts are joinable since they are "defined by the same or similar statutory provisions and consequently are the same or similar in law" (CPL 200.20, subd 2, par [c]). Offenses so joined, however, may, "in the interest of justice and for good cause shown," be tried separately upon application of either a defendant or the People. (CPL 200.20, subd 3.) The power to grant such relief rests in the court's sound discretion (*People v Forest,* 50 AD2d 260; CPL 200.20, subd 3.) Given the unusual circumstances of this case, that discretion should have been exercised in defendant's favor since the coupling of the integrity test with the earlier Nekritz incident was so inherently prejudicial as to deprive him of a fair trial.

That the test — the subject of the second count — was staged solely to confirm the accusations relating to the events of May 30, 1981 seems fairly obvious. Indeed, in his opening statement the prosecutor stated: "After the June 27th incident, a decision was made by investigators from the Internal Affairs Division and the Special Prosecutor's Office to attempt a test situation in which Officers Napolitano and Figueroa would be directed to a particular scene, and where their attention would be directed to the existence of some money to see what would happen." Thus, the reality of the situation is that the second incident was arranged to convince IAD and the Special Prosecutor of the validity of Nekritz's charges. If these agencies needed a test result before they were satisfied then surely a jury, notwithstanding the customary caution to segregate and consider the crimes separately, would be similarly persuaded by learning that defendant had swallowed the bait in the integrity test. Consequently, this is not, as the People contend, an instance of a mere joinder of two totally independent crimes, albeit of a similar nature. (See, e.g, *People v Hetherington,* 27 NY2d 242.)

The integrity test, having derived its very existence from the Nekritz incident, was not only interdependent with it, but, of necessity, the proof offered on the integrity test bolstered and supported the initial accusation of police corruption, which was largely uncorroborated and depended upon the credibility of a complainant whose account, at least in some respects, was bizarre. Thus, the integrity test was the linchpin of the case against defendant in the Nekritz affair. The evidence of defendant's performance in the integrity test as to which, realistically, he had no defense whatever, compellingly served to show his guilt in the Nekritz incident, as to which, arguably, he had a defense. The People, it should be noted, have never argued that the two incidents are joinable on the ground that proof of one would be material and admissible as evidence-in-chief upon a trial on the other (CPL 200.20, subd 2, par [b]). In the circumstances neither conviction can stand. Each drew sustenance from the other.

Finally, I believe that the inherent prejudice to defendant from joinder of the two counts is so self-evident that the error in refusing a severance is preserved notwithstanding that defendant premised his motion on the ground that the evidence of identification in one of the incidents would have a cumulative effect on the evidence offered in the other. Identification, of course, was never an issue. Defendant did, in part, base his severance application on "the methodology * * * used in the investigation of this matter." That alone should have been sufficient to alert the court to the prejudice inherent in joinder.

Accordingly, the judgment of conviction should be reversed, the motion to sever granted, and the matter remanded for further proceedings.